STEVENS *v.* STEVENS.

1. EVIDENCE—DYING DECLARATIONS—HEARSAY.
    Dying declarations are exceptions to the hearsay rule (CL 1948, § 767.72).

2. AUTOMOBILES — PLEADING — OPENING STATEMENT — MOTION FOR JUDGMENT — GROSS NEGLIGENCE.
    Defendant's motion for judgment following opening statement by plaintiff was properly denied, where it then appeared from pleading and opening statement that defendant host motorist before commencing trip on a rainy, foggy night had had 2 drinks of whiskey, declined to go more slowly while driving 90 to 95 miles an hour when requested to do so by his pregnant wife who was also present in car and died as result of injuries received when car failed to make a sharp right turn, hit and broke a concrete culvert and came to rest some 50 feet therefrom and upside down, since such conduct might properly be regarded as gross negligence or wilful and wanton misconduct (CLS 1956, § 257.401).

3. JUDGMENT—PLEADING—OPENING STATEMENT.
    A motion for judgment may be granted where, from the opening statement and the pleadings, it is clear that the plaintiff would not be entitled to judgment even though the facts proposed for proof were conceded and the inferences most favorable to plaintiff were drawn.

4. NEGLIGENCE—SAFETY OF OTHERS.
    An actor must act, especially when risk to human life is involved in the action, with due regard to the safety of others and the fact that no money changes hands is not determinative of duty or liability.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 8]  20 Am Jur, Evidence § 611.
[2, 5–7]  5A Am Jur, Automobiles and Highway Traffic §§ 531, 532.
    What amounts to gross negligence, recklessness, or the like, within statute limiting liability of owner or operator of automobile for injury to guest.  74 ALR 1198, 86 ALR 1145, 96 ALR 1479.
[3]  53 Am Jur, Trial §§ 339, 340.
[4]  38 Am Jur, Negligence § 29 *et seq.*
[9]  15 Am Jur, Damages §§ 72, 140, 205 *et seq.*

5. AUTOMOBILES—GUEST PASSENGERS—GROSS NEGLIGENCE.

To have liability under the guest passenger act for gross negligence or wilful and wanton misconduct of the motorist theremust be a knowledge on the part of the latter of the existence of a very dangerous situation, an ability to avoid it, and a reckless and complete disregard of the rights of passengers and a disregard of warnings, acts of a different quality than those comprising mere negligence, although acts of ordinary negligence may be included (CLS 1956, § 257.401).

6. SAME—GUEST PASSENGERS—GROSS NEGLIGENCE.

Normally, the external conduct of the motorist, not his state of mind, is examined when it is claimed he was guilty of gross negligence or wilful and wanton misconduct resulting in injuries to his guest passenger, although the motorist's mental attitude may have a bearing (CLS 1956, § 257.401).

7. SAME—GUEST PASSENGERS—GROSS NEGLIGENCE—EVIDENCE.

Finding of trial court in nonjury case, brought by guest passenger, that defendant motorist was guilty of gross negligence subjecting him to liability *held*, not error, where record shows he had had shortly before the accident 2 drinks of whiskey, that he had quarreled with his wife, that the night was rainy and foggy, that the road was wet, contained a sharp curve, and car was driven so fast that it broke a large cement culvert, apart from dying declaration by wife who received fatal injuries in same accident (CLS 1956, § 257.401).

8. APPEAL AND ERROR—QUESTIONS REVIEWABLE—DYING DECLARATIONS—EVIDENCE.

Whether or not dying declarations are admissible in a civil as well as a criminal case is not determined, where imposition of liability upon motorist for gross negligence is made without reference to such declarations (CL 1948, § 767.72; CLS 1956, § 257.401).

9. DAMAGES—MEDICAL AND HOSPITAL EXPENSES—DISABILITY—PAIN AND SUFFERING.

Award of $2,888 for medical and hospital expenses, $4,000 for disability, and $15,000 for pain and suffering to guest passenger who sustained multiple fractures of ribs, arm and leg bones and whose stomach was forced into the pleural cavity, was hospitalized for 37 days and unable to work for more than a year and suffered pain until time of trial some 20 months later, *held*, not excessive.

Appeal from Monroe; Weipert, Jr. (William J.), J. Submitted October 9, 1958. (Docket No. 30, Calendar No. 47,586.) Decided February 19, 1959.

Case by William Stevens, Jr., against William A. Stevens for injuries sustained while a guest passenger in automobile. Judgment for plaintiff. Defendant appeals. Affirmed.

*Cubbon & Rice,* for plaintiff.

*Ready & Braunlich,* for defendant.

SMITH, J. The plaintiff, William Stevens, Jr., brought this action to recover for injuries sustained while riding as a guest in an automobile driven by the defendant, his brother, William A. Stevens. The trial court, sitting without a jury, entered judgment in favor of the plaintiff in the sum of $21,888. Error is charged upon the admission in evidence of a dying declaration and the denial of motions designed to test whether the facts that the plaintiff proposed for proof constituted a basis for liability under the guest statute,[*] whether findings made by the court were supported by sufficient evidence, and whether the award of damages was excessive.

The facts may be very simply stated. The driver of the car involved was defendant William A. Stevens. He was driving a 1950 Chrysler from Toledo, Ohio, to Jackson, Michigan. Prior to commencing the journey he stopped at Johnny's tavern and enjoyed a "shot" of whiskey. He then left with his brother, plaintiff herein, whom he had met by chance at the bar, and picked up his wife, Leona. The group then went to a second bar, where another drink of whiskey was had. Thus fortified, the trip northward to Jackson was commenced. By this time the driver and his

---

[*] CLS 1956, § 257.401 (Stat Ann 1952 Rev § 9.2101).

wife were quarreling to the degree that the brother took a seat in the center, between the two.

So, as we noted, started the journey, somber from its very inception. The road traveled, running generally north and south, was highway US–223, a blacktop, 2-lane road. The night* was "very foggy," the road surface wet. Just south of Ottawa Lake the road makes a sharp turn to the right. Here the car left the road, hit a concrete culvert with such force that it broke off "quite a large chunk" (some 4 feet long, 8 inches in thickness, and 18 inches high), and proceeded onward approximately 50 feet, coming to rest on its top, upside down, "a mangled mass of metal," states the trier of the facts, "which it is hard to realize ever was an automobile." The defendant had been thrown out of the car but the 2 passengers remained therein. The plaintiff was wedged behind the wheel, his stomach, to quote his own words, forced "up in my chest." The defendant's wife, also in the wreckage, was also "in bad shape," dying later from her injuries.

Her account of the accident (objections to which we will hereinafter consider) was given to her sister-in-law, while in the hospital. "She [the wife] would sort of doze off like and then she would wake up with a jerk, and I asked her what was wrong, and she would relive the episode of going through the windshield." At about 10 o'clock the night before she died "she seemed like there wasn't much hope for her." She said she was "ready to meet God." What followed was hearsay. In certain criminal trials, at least, both by common law and, in this State, by statute (CL 1948, § 767.72 [Stat Ann § 28.1012]), dying declarations are admissible despite the hearsay rule. The exception comes down to us from simpler times. It was believed that the awareness of imminent death invested the occasion with a

---

* December 23, 1955.—REPORTER.

solemnity not surpassed by the judicial oath itself, however impressively it might be mumbled in court by the bailiff. It was believed, also, some now think quaintly, that the lack of opportunity for repentance or amends would deter from falsehood even the most debased. The trial court had before him the declaration of a girl of 17 years, carrying her unborn child. One, normally, has not, at 17, had time to learn much of the practice of dissimulation or deceit. If, moreover, she was aware of the legal significance of what she was saying as it affected liability under the guest passenger act the record does not disclose it. Her life, she believed, was drawing to a close, her youth, her maturity, and her old age having been telescoped together in a split instant of time as the car left the curve. The trial court obviously believed that the girl was aware of impending death, impressed with the finality and solemnity of the occasion, and that she was speaking the truth, shorn of incentive to lie or distort, to shield or to betray. That a crime was not involved, but a mere civil action, did not, in his opinion, rob her statement of the essential guaranty of truth inherent in the occasion of its utterance. The statement was, accordingly, admitted.

The night of the accident, her sister-in-law reports her as stating, "was rainy and foggy." Her husband was racing with a station wagon. The curve, she knew, was there. (The route was a familiar one to defendant.) She told him, she is reported to have said, to slow down, "because he was doing around between 90 and 95." He is said to have told her in reply, that "he wouldn't because he knew that road, he traveled it enough. And instead of making that, he just didn't make the curve." Leona died a few hours after making this statement.

The substance of the above chronology of asserted facts was stated by plaintiff in his opening statement, at the close of which defendant moved "for a

judgment based upon the opening statement." This was properly denied. Such motion for judgment may be granted where, from the opening statement and the pleadings, it is clear that the plaintiff would not be entitled to judgment even though the facts proposed for proof were conceded and the inferences most favorable to the plaintiff were drawn. See *Vida* v. *Miller Allied Industries, Inc.*, 347 Mich 257; *Ballinger* v. *Smith*, 328 Mich 23 (motion for a directed verdict in a jury case). From the facts recited, however, one might reasonably infer that the defendant drove deliberately at a speed involving grave and apparent danger, particularly in view of the condition of the road and the weather. Such conduct might properly be regarded as gross negligence or wilful and wanton misconduct. See *Tien* v. *Barkel*, 351 Mich 276; *McLone* v. *Bean*, 263 Mich 113; *Powers* v. *Wilson* (CCA), 110 F2d 960.

Plaintiff's proofs were then made, including the dying declaration above summarized, at the conclusion of which defendant moved that the dying declaration be stricken (denied), following which motion was made for "a verdict of no cause of action based upon the failure of the plaintiff to make a prima facie case." This, also, was denied. Defendant having offered no proofs the court thereupon entered judgment for plaintiff for a total of $21,888. Motion to set aside the judgment and for new trial were denied, the court finding that even without the dying declaration, the evidence sufficiently established negligence under the guest passenger act, *supra*. The appeal was taken upon grounds hereinbefore summarized.

We are presented, once again, with the necessity for interpreting the Michigan version of the guest passenger acts. These acts, passed practically simultaneously as time is reckoned in the law, came to the various States in the late 1920's and early 1930's.

Our Court has shared with the other courts of the nation the most extreme difficulties in interpretation. The dissenting opinion (addressed to the claimed emergency) filed in the case establishing the constitutionality of the act[1] was prescient of the division the court would know, both immediately[2] and in the years to come, as our Court sought vainly to harmonize the provisions of the act with the principles of the common law. A distinguished student of the law (Prosser, Torts [2d ed], pp 450, 452), after the review of many cases, has concluded that "the whole matter is surrounded by considerable confusion." See, also, Florida's Automobile Guest Statute, 11 Univ of Fla L Rev 287 (1958). Under these circumstances our continued piling of case on case without an examination of the causes of our difficulty can only result in confusion the worse confounded.

Our difficulties with the interpretation of this act arise from an irreconcilable conflict between the provisions of the act and the principles and traditions of the common law, the customs and convictions of our people. Thus, our law has long held that one who undertakes to act must act with a due regard for the safety of others. The fact that no money changes hands is not determinative of this duty or of liability. So it is that the common carrier must, at the common law, show a gratuitous passenger the same care as a paying passenger.[3] A doctor must observe the standard of due care, even with respect to a charity patient.[4] A rescuer, indeed, must act with all the care demanded by the circumstances, despite the noble nature of his act.[5] The

---

[1] *Naudzius* v. *Lahr,* 253 Mich 216 (74 ALR 1189, 30 NCCA 179).
[2] *Finkler* v. *Zimmer,* 258 Mich 336; *Bobich* v. *Rogers,* 258 Mich 343; *Boyle* v. *Moseley,* 258 Mich 347.
[3] 2 Hutchinson, Carriers (3d ed), § 1021.
[4] See 41 Am Jur, Physicians and Surgeons, § 82, pp 200–202. Cases are collected in 14 LRA 429 and 141 ALR 122.
[5] *Blackwell* v. *Omaha Athletic Club,* 123 Neb 332 (242 NW 664).

shining thread traceable through the tapestry of these decisions is well known to all of us, the value placed by our people upon human life and human safety. The thought requires no elaboration. Our pen can add nothing to its lustre. There it stands, crystal clear, illumined by its own intrinsic radiance.

Hand in hand with this rubric of the common law runs another: the fulfillment of trust imposed. Rightly or wrongly, our law has prided itself that those who put their faith in another shall not suffer unrecompensed harm through that other's falsity or lack of care. It has been our boast that when one entrusts another with life or property relying upon a relationship of trust and confidence, rather than the weapons and guarantees of the business world, a performance of duty the most exacting will be demanded, a conformity not with the arm's length standards of the market but rather the infinitely nicer standards of the hearth and the heart. The authorities we need not cite.

The guest passenger acts changed all of this. The friends of the driver, his family, those to whom he stands in the closest relationship of faith, and trust, and confidence, must suffer injury at his hands without recompense, solaced only by the thought that, after all, the skull was cracked by a friendly hand. His legal status, this invited guest, is no better than that of a trespasser. The hospital bill, the loss from the long illness, all arising from the wrong of another and without fault on the part of the victim, must be shouldered without the aid of him who did the wrong. Why? Because the relationship between them was one of trust and friendship. No money had changed hands. If, however, not the neighbor himself is carried to town, but rather his livestock to the slaughterhouse, many modern courts will permit full recovery for injury to the unfortunate animal through failure to use reasonable care for its safety.

Is this one answer of an enlightened people to the hallowed question: "How much then is a man better than a sheep?"*

It is against this background that we see our courts dividing, redividing, and dividing again as it is sought to harmonize the legislative act with the yet-applicable provisions of the common law. The divisions, it seems probable, will continue.

Appellant urges that the required showings of gross negligence or wilful and wanton misconduct have not been made. In order to have liability under the guest statute there must, he urged in his motion for verdict of no cause of action, "be basically a knowledge of the existence of a very dangerous situation, and ability to avoid it, and a reckless and complete disregard of the rights of passengers, and a disregard of warnings." It is likewise argued on appeal that "the proofs do not show (1) a warning; (2) racing with another vehicle; or (3) any opinion as to speed; and as such do not establish a reckless disregard of life or property, as required to establish gross negligence."

The argument made misconceives the basis for liability. It is normally imposed not alone because a host driver violates warnings, not alone because he speeds, not alone because he is inattentive to traffic or the rules of the road. It is imposed because the conduct, usually made up of the sum total of these factors, manifests a high degree of danger, a manifest probability that harm will result therefrom, and an utter disregard of the probable consequences. The acts are of a different quality than those comprising mere negligence. Acts of ordinary negligence are included, of course, but as was well stated in *Peyton* v. *Delnay*, 348 Mich 238, 248, quoting an earlier opinion, there is more: ordinary

---

* *Matt.* 12:11 and 12, Authorized Version.

negligence plus "a wilful and wanton disregard for public safety."

In testing for the statutory standard of "gross negligence or wilful and wanton misconduct," as for the common-law standard of ordinary negligence, we normally examine the external conduct of the defendant, not his state of mind. As respects ordinary negligence, e.g., an intersection accident, we do not delve into the state of mind of the driver. We ask whether he has conducted himself as a reasonably prudent man under the circumstances presented. Likewise with respect to gross negligence, and wilful and wanton acts, which we need not on these facts distinguish, if, indeed, rational distinction is possible. Should the driver of a school bus injure his charges through passing a car at high speed on the wrong side of a blind curve we would not be too much concerned with his professed sensitivity for the welfare of his helpless charges. His conduct is judged by what he did under the circumstances confronting him at the time. Holmes summarized (Collected Legal Papers, p 117) in these words:

"The standard applied is external, and the words malice, intent, and negligence, as used in this connection, refer to an external standard. If the manifest probability of harm is very great, and the harm follows, we say that it is done maliciously or intentionally; if not so great, but still considerable, we say that the harm is done negligently; if there is no apparent danger, we call it mischance."

This is not to say that the mental attitude has no bearing. It may, particularly with respect to isolated acts of what would ordinarily be called "mere" negligence (going to sleep at the wheel, driving on the wrong side of the road, et cetera), be conclusive as to the gross or wanton and wilful character of the act. 2 Harper and James, Torts,

§ 16.15. Disregard of a passenger's warning, or warnings, will have a bearing in deciding whether we have passed the line dividing mere negligent conduct from the act different in kind, the act wanton or gross.  But it is not a *sine qua non* to liability. Thus speed alone, if so grossly excessive as to shock the conscience with its overwhelming probability of harm, may be enough, as the trial court cogently observed in the case before us.  "In several reported cases," held *Harlow* v. *Van Dusen,* 137 Cal App2d 547, 550 (290 P2d 911), "a speed of 60 miles · per hour has been held to constitute wilful misconduct when conjoined with such facts as a damp highway, a misty night requiring windshield wipers," et cetera.

The trial court, considering the type and condition of the road traveled, the curve, the speed of the car,\* the fog, the liquor, and the quarrel, determined, apart from the dying declaration, that defendant had violated the statutory duty of care. There has been no error.

In the view we have taken of the case we do not reach the question whether dying declarations are admissible in civil as well as criminal cases.  For those with the time and the interest to pursue the matter the literature is abundant.  See 5 Wigmore, Evidence (3d ed), § 1436; National Conference of Commissioners of Uniform State Laws, Uniform Rules of Evidence, Rule 63(5);† *People* v. *Stison,* 140 Mich 216 (112 Am St Rep 397, 6 Ann Cas 69); *Thurston* v. *Fritz,* 91 Kan 468 (138 P 625, 50 LRA

---

\* *Cf.,* Justice CARR in *Cain* v. *Enyon,* 331 Mich 81, 88: "The car left the road at a curve and the results of its impact with obstacles in its path suggests that it was traveling at a high rate of speed." Justice BLACK in *Tien* v. *Barkel,* 351 Mich 276, 285: "There is evidence that the defendant's car, after it left the pavement, traveled 520 feet on land and in air prior to striking—right broadside and with tremendous wrap-around force—what the photographs portray as an impregnable old oak tree."

† See Handbook of National Conference of Commissioners, 1953, p 201.—REPORTER.

NS 1167, Ann Cas 1915D, 212). When a ruling upon the issue is necessary to decision it will be made. Until then we will not grasp the nettle.

The plaintiff sustained multiple fractures of the ribs and fractures of the bones of his arms and legs; his stomach was forced into the pleural cavity. He was hospitalized for 37 days and totally unable to work for more than a year, suffering severe pain, according to his testimony, continuing to the time of trial.* The award of damages, comprising $2,888 for medical and hospital expenses, $4,000 for disability, and $15,000 for pain and suffering, seems not excessive and we see no reason to disturb it.

The judgment is affirmed. Costs to appellee.

KELLY, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

DETHMERS, C. J., and CARR, J., concurred in the result.

---

* August 26, 1957.—REPORTER.